No. 20,024.

THE STATE OF KANSAS, *Appellant*, V. GEORGE L. MCCULLAGH
and H. B. SAVAGE, *Appellees*.

### SYLLABUS BY THE COURT.

1. MIGRATORY BIRDS — *Protection* — *Within Exclusive Control of State.*
Congress has no power to prescribe regulations for the protection of
migratory game birds while within the boundaries of a state.

2. SAME. A state law forbidding the shooting of ducks from a motor-
boat is a valid exercise of the police power, notwithstanding the same
act limits the number to be killed by one person in a day.

Appeal from Cherokee district court; EDWARD E. SAPP,
judge. Opinion filed December 11, 1915. Reversed.

*S. M. Brewster*, attorney-general, *F. W. Boss*, county attor-
ney, and *Don H. Elleman*, assistant county attorney, for the
appellant.

*O. S. Barton*, of Carthage, Mo., *Truman T. Burr*, and *C. D.
Sapp*, both of Galena, for the appellees.

The opinion of the court was delivered by

MASON, J.: An information was filed charging George L.
McCullagh and H. B. Savage with having violated the game
laws of the state by shooting wild ducks from a motor-boat,
on April 2, 1914. A motion to quash was sustained, and the
state appeals.

The state law undertakes to forbid shooting at or killing
wild game birds from a motor-boat. (Laws 1913, ch. 199,
§ 1, amending Laws 1911, ch. 198, § 15.) The defendants
maintain that this and all other state laws for the protection
of migratory birds are superseded and nullified by an act of
congress. The agricultural department appropriation act of
March 4, 1913, contains these provisions:

"All wild geese, wild swans, brant, wild ducks, snipe, plover, wood-
cock, rail, wild pigeons, and all other migratory game and insectivorous
birds which in their northern and southern migrations pass through or
do not remain permanently the entire year within the borders of any
state or territory, shall hereafter be deemed to be within the custody and
protection of the government of the United States, and shall not be
destroyed or taken contrary to regulations hereinafter provided therefor.

The State v. McCullagh.

"The Department of Agriculture is hereby authorized and directed to adopt suitable regulations to give effect to the previous paragraph by prescribing and fixing closed seasons, having due regard to the zones of temperature, breeding habits and times and line of migratory flight thereby enabling the department to select and designate suitable districts for different portions of the country, and it shall be unlawful to shoot or by any device kill or seize and capture migratory birds within the protection of this law during said closed seasons, and any person who shall violate any of the provisions or regulations of this law for the protection of migratory birds shall be guilty of a misdemeanor and shall be fined not more than $100 or imprisoned not more than ninety days, or both, in the discretion of the court.

"The Department of Agriculture, after the preparation of said regulations, shall cause the same to be made public, and shall allow a period of three months in which said regulations may be examined and considered before final adoption, permitting, when deemed proper, public hearings thereon, and after final adoption shall cause the same to be engrossed and submitted to the president of the United States for approval: Provided, however, That nothing herein contained shall be deemed to affect or interfere with the local laws of the states and territories for the protection of non-migratory game or other birds resident and breeding within their borders, nor to prevent the states and territories from enacting laws and regulations to promote and render efficient the regulations of the Department of Agriculture provided under this statute." (Part 1, 37 U. S. Stat. at Large, ch. 145, p. 847, 4 U. S. Comp. Stat. 1913, § 8837.)

The agricultural department has defined the closed season for the birds referred to, varying with the species and locality, in regulations which have been approved and published, and which forbid the killing of wild ducks in Kansas between February 1 and September 15. (U. S. Dept. of Agr., Farmers' Bulletin No. 628, p. 12.) The state law leaves an open season from September 1 to April 15. (Laws 1913, ch. 199, § 1.) In the briefs of both parties it is assumed that the federal regulations, if valid, supersede the state law. The ordinary rule is that the state may punish the same act that constitutes an offense against the laws of the general government, unless the federal legislation is made exclusive, expressly or by fair implication. (12 Cyc. 137; *Sexton v. California,* 189 U. S. 319; but see *Easton v. Iowa,* 188 U. S. 220.) In *State v. Sawyer,* (Maine, 1915) 94 Atl. 886, it was held that the language of the act above quoted indicates a legislative purpose that the federal regulations were to be exclusive. But there the prosecution was for killing game out of season. So far as relates to fixing

the period within which birds may be hunted the laws of the state and nation may perhaps be regarded as undertaking to cover fully the same field, and to be not complementary, but in a degree antagonistic. Here, however, the conduct complained of relates to the manner and not to the time of killing the birds. It might be argued, by analogy with the subject of interstate commerce, that if the regulation of hunters in their conduct toward migratory birds is committed to the control of the federal government, congress must be deemed to have intended them to be free from legislative interference with respect to matters concerning which it has not acted, and that beyond the establishment of a closed season no protection should be afforded the birds, except such as might be given by the states under the express authority granted them to enact laws to promote and render efficient the regulations of the department. Even the exception might be questioned as an attempt to delegate the legislative power of congress. Possibly the provision of the state law here invoked may be regarded as promoting the department's regulations. It in no way conflicts with them, and is directed to the same general end. As these questions have not been argued, the case will be considered in the light in which it has been presented—as turning upon the validity of the act of congress.

In the only reported cases dealing with the question the federal act referred to is held to be unconstitutional because the power undertaken to be exercised is not among those conferred upon congress. (*United States v. Shauver,* 214 Fed. 154; *United States v. M'Cullagh,* 221 Fed. 288; *State v. Sawyer,* [Maine, 1915] 94 Atl. 886.) The United States district court in South Dakota is said to have held to the contrary (2 West Pub. Co's. Docket, No. 17, p. 1476), but if an opinion was written in that case it does not appear to have been published. The power referred to must be found, if at all, in the provision of the national constitution relating to interstate commerce, or in that authorizing congress to make regulations respecting the territory or other property belonging to the United States. (U. S. Const., art. 4, § 3.)

The natural flight of wild fowl from one point to another does not constitute "commerce," unless that word be expanded beyond any significance heretofore given it. Whatever other

element may be spared from a definition of the term, it has not been heretofore applied to processes or occurrences not directed or affected by human intelligence. But if the fact were otherwise, the circumstance that birds of a particular species do not habitually remain throughout the year in the same state could hardly bring them within the control of congress on the theory that they were thereby impressed with a national character as the subjects of interstate commerce. This court once decided that the legislature could not prohibit the shipment out of the state of prairie-chickens, lawfully caught or killed in Kansas, because such a prohibition was an interference with interstate commerce. (*The State v. Saunders*, 19 Kan. 127.) The supreme court of the United States explicitly disapproved the decision, saying that its reasoning was inconclusive because it overlooked the authority of the state over property in game within its confines. (*Geer v. Connecticut*, 161 U. S. 519, 534.)

The argument for federal control based upon the power given to congress to make regulations respecting the property of the United States fails because in our judgment the habit of migration does not vest in the federal government the title to the animal possessing it. In the case last cited, and in many others, wild animals are declared to be subject to the control of the state—to belong to the people of the state—and the rule has been repeatedly applied to migratory birds. The authority of a state to grant hunting privileges to its citizens to the exclusion of those of other states is generally recognized, and is based upon the same principle. (19 Cyc. 1008; Note, 26 L. R. A., n. s., 794. See, also, 3 C. J. 18.) Doubtless the general government could, if it had the authority, give game birds more effective protection than they now enjoy, or than could be afforded them by the separate action of the states. But congress can derive no power to legislate on a particular subject from the fact that it can handle the matter more efficiently than the legislatures of the various states. (*Kansas v. Colorado*, 206 U. S. 46, 91.)

All phases of the questions involved are treated so fully in the three cases already cited in this opinion as to make further discussion superfluous. In the absence of a decision by the federal supreme court upholding the act of congress no course seems open but to enforce the state law, even if in conflict with it.

An additional objection is made to the validity of the statute on which the action is based, on the ground that the prohibition against shooting ducks from a motor-boat is an unreasonable exercise of the police power, and deprives an individual of the use of his property without due process of law. A multitude of regulations of the methods of hunting and fishing, designed to limit the amount of game and fish taken, have been upheld. (19 Cyc. 1012.) Other conditions being the same, more birds could be shot within the same time from a motor-boat than from a rowboat. The restriction in that regard is a means sufficiently adapted to the end in view to justify the legislature in its adoption. The federal court for the northern district of California has held invalid a statute of that state forbidding the use of a magazine gun in shooting certain game birds. (*In re Marshall,* 102 Fed. 323.) The statute also forbade any person to kill more than twenty-five of such birds in a day. The court reasoned that the manifest purpose of the legislature was to prevent a single hunter from getting more than a fixed amount of game, and so long as he did not exceed the limit it made no difference what means he employed. The Kansas statute under consideration makes it unlawful for any one person to kill more than twenty wild ducks in one day. (Laws 1913, ch. 199, § 2.) It is argued that the end sought was manifestly to prevent one person from taking more than twenty ducks in a day, and that the legislature has no power to say in what manner that number may be taken. The argument is unsound. The general purpose of the statute is to diminish the slaughter of game. This is sought to be accomplished by imposing various restrictions upon the hunter. He is not granted an unconditional right to slay twenty ducks in a day. The prohibition against his use of a motor-boat is not designed solely to keep him within the numerical limit. The two restrictions are independent, each operating, as do a number of others of a similar character, to promote the same general end.

The judgment is reversed and the cause remanded with directions to overrule the motion to quash.