Argued October 6, affirmed November 16, petition for rehearing filed December 10, 1920, denied January 25, 1921.

## UNION FISHERMEN'S CO. *v.* SHOEMAKER.

(193 Pac. 476; 194 Pac. 854.)

**Statutes—Construed to Give Effect to Every Clause, if Possible.**

1. The courts are required to construe a statute so as to give effect to every clause thereof, if possible.

**Statutes—Construed to Ascertain Intention of Legislature.**

2. In construing a statute, the intention of the legislature is to be sought, and, if the words are not sufficient to manifest such intention, it is to be ascertained by considering the context, subject matter, the necessity for the law, the circumstances of its enactment, the mischief to be remedied, and the object to be attained.

**Statutes — If Intent not Ascertainable, Reasonable Construction Adopted.**

3. If the intention of the legislature in enacting a statute cannot be ascertained, the courts should give the statute a reasonable construction consistent with the general principles of law.

**Fish—Catching in the Sea Beyond Three-mile Limit and "Outside" of River. Means Between Lines Drawn from Headlands.**

4. Laws of 1919, page 653, Section 5, prohibiting the sale or possession of salmon taken beyond the three-mile line outside of the Columbia River during the closed season for that river, means fish taken beyond that line between lines drawn from the north and south headlands at the mouth of the river, which construction gives the word "outside" its ordinary meaning of to the exterior of, without, outward from, is definite and certain, and does not lead to absurd results, since the distance between the headlands is seven miles, so that that section does not apply to all fish caught anywhere by fishermen using landing places along the Columbia River as their base.

**Constitutional Law—"Police Power" Defined.**

5. Police power, is the power to make all laws which, in contemplation of the Constitution, promote the public welfare, and it embraces the inherent sovereign power of the state, within constitu-

tional limitations, to promote the order, safety, health, morals and general welfare of society.

**Fish—Game—Protection of Fish and Game is Within Police Power.**

6.    The preservation of fish and game has always been considered to be within the proper domain of the police power.

**Constitutional Law—Final Determination of Limits of Police Power is for Courts.**

7.    The legislature is not the final judge of the limitations of the police power, and since its action must be reasonably necessary for the public benefit, the validity of all police regulations depends upon the judicial test of reasonableness, though the legislature must primarily determine the necessity or expediency of the measures adopted.

**Constitutional Law—Legislature has Large Discretion Under Police Power.**

8.    The courts, in applying the judicial test of reasonableness to a statute enacted under the police power, will accord to the legislature a large discretion in determining, not only what the public interests require, but also what measures are necessary for the protection of such interests.

**Constitutional Law—Statutes Presumed Valid.**

9.    In applying the test of judicial reasonableness to an act passed under the police power, the presumption is in favor of the reasonableness and validity of the regulation.

**Fish—Prohibiting Sale of Fish Caught During Closed Season not Unreasonable.**

10.    In view of the habits of salmon fish to run in different rivers at different times, so that the closed season to protect them during part of the run must be different for different rivers, Laws of 1919, page 653, Section 5, which prohibits the sale or possession of salmon caught beyond the three-mile limit outside a certain river during the closed season for that river, is not an unreasonable police regulation, because it is unusual, since prohibition of sales of fish and game during the closed season are usual, and the only unusual features of the statute are necessitated by the unusual conditions.

**Fish—Can Prohibit Sale of Fish Caught Outside Three-mile Limit.**

11.    Though a state could not make unlawful the catching of fish beyond the three-mile limit, Laws of 1919, page 653, Section 5, which merely prohibits within the state the sale or possession of fish caught outside such limits, is within the power of the state to make effective its prohibition against taking fish during the closed season from waters over which it has jurisdiction.

**Fish—Right to Sell in Other States Does not Invalidate Prohibition.**

12.    Laws of 1919, page 653, Section 5, prohibiting sale or possession within the state of fish caught beyond the three-mile limit outside the Columbia River, is not invalid as an unreasonable police regulation, which fails to accomplish its purpose because the State of Washington has no similar statute, so that fish caught within

such limits may be sold in that state, and thereby the purpose of the Oregon statute is partially defeated.

**Statutes—Regulating Fishing in Particular Stream not Discriminatory.**

13.   Laws of 1919, page 653, Section 5, is not invalid as discriminatory, and not of general application because it prohibits the sale and possession of fish caught between certain dates only when they are caught within or outside the mouth of the Columbia River.

**Commerce—Prohibition of Sale of Fish Caught Outside Limits not Regulation of Foreign or Interstate Commerce.**

14.   Laws of 1919, page 653, Section 5, prohibiting the sale or possession within the state of salmon caught beyond the three-mile limit outside the Columbia River, does not° contravene the foreign and interstate commerce clause of the federal Constitution.

**States—Prohibition of Sale of Fish Caught in Closed Season Held not to Violate Agreement With Other State.**

15.   The agreement between the States of Oregon and Washington, embodied in Laws of 1915, page 233, Section 20, made with the consent of Congress, that neither would, without the consent of the other, enact any law which would conflict with the terms of the compact, which compact was limited to laws and regulations which would affect their concurrent jurisdiction over streams, is not violated by Laws of 1919, page 653, Section 5, prohibiting within the state the sale or possession of fish caught beyond the three-mile line outside the Columbia River during the periods fixed by both states as the closed season for that river.

### ON PETITION FOR REHEARING.

**Constitutional Law—Wisdom of Legislation is not Question for Courts.**

16.   Laws of 1919, page 653, Section 5, regulating salmon fishing in the Columbia River and forbidding the use of purse seines, etc., on the Oregon side, cannot be held unconstitutional because the law works harshly against the Oregon canneries, the State of Washington providing no similar restrictions; the wisdom of the act being for the legislature.

From Clatsop: JAMES A. EAKIN, Judge.

Department 1.

The Union Fishermen's Co-operative Packing Company and five other Oregon corporations own and operate in Oregon large salmon canneries at or near the mouth of the Columbia River. The defendant Carl D. Shoemaker was, at the time of the commencement of this suit, the game warden and master fish

warden of the State of Oregon, and it was his official duty to enforce the game and fish laws of this state.

Several thousand fishermen are engaged in catching salmon fish with which to supply the canneries operated by the plaintiffs. A considerable number of these fishermen are employees of the plaintiffs, while the remaining fishermen, although not employees of the plaintiffs, fish for the purpose of selling their catches to the plaintiffs. Many millions of dollars have been invested by the plaintiffs in canneries and in boats, nets, and other fishing gear, "for the purpose of catching, packing, freezing, canning, and preserving salmon fish"; and the complaining corporations enjoy "a large and lucrative business resulting from the sale, freezing, packing, and canning of such salmon fish."

The amended complaint gives an account of the fish legislation enacted in the States of Oregon and Washington in the years 1915, 1917, and 1919. Among the measures enacted by the Oregon legislative assembly is Chapter 367, Laws of 1919; and Section 5 of that enactment is the storm center of this litigation. Section 5 of Chapter 367, Laws of 1919, reads as follows:

"It shall be unlawful for any person to purchase, or offer for sale, any food fish of any variety unlawfully taken from any of the waters of this state, or from any of the waters over which the State of Oregon has concurrent jurisdiction, or to have in their possession or to purchase or offer for sale, any salmon fish of any variety taken beyond the three mile line outside of the Columbia River between the following dates, which are closed seasons in the waters of the Columbia River within the State of Oregon, and over which the State of Oregon has concurrent jurisdiction, to wit: Between 12 o'clock, noon, March 1st, and 12 o'clock, noon, May 1st, and between

12 o'clock, noon, August 25th, and 12 o'clock, noon, September 10th, of any year.''

The plaintiffs allege that, because of reasons specified by them, Section 5 is ineffective and inoperative; and the plaintiffs further aver that, since Section 5 is inoperative, ''these various plaintiffs herein, through fishermen employed for such purpose, have signified their intention, and are about to engage in the catching of salmon fish beyond the three-mile line outside of the Columbia River, and in the purchase from said fishermen for the operation of their canneries at or near the mouth of the Columbia River of salmon fish caught beyond the three-mile line outside of the Columbia River,'' but that the defendant has threatened to, and unless restrained ''will, arrest any and all persons so engaged in catching such salmon fish beyond the three-mile line outside of said Columbia River, and these plaintiffs, in the event these plaintiffs should purchase of such fishermen for the operation of their canneries at or near the mouth of the Columbia River, any salmon fish caught beyond the three-mile line outside of said Columbia River, which said arrests would greatly harass and embarrass these various plaintiffs in the operation of their respective canneries at or near the mouth of the Columbia River, and would prevent these plaintiffs from at all operating their said respective canneries at or near the mouth of the Columbia River, resulting in great financial loss to these plaintiffs, the exact amount of which it would be impossible to estimate.'' The amended complaint concludes with a prayer for a decree, restraining the defendant from attempting to enforce Section 5 of Chapter 367, Laws of 1919.

The trial court sustained a demurrer to the amended complaint, and, upon the refusal of the plaintiffs to plead further, a decree was entered, dismissing the amended complaint and the suit. The plaintiffs appealed.

Subsequent to the rendition of the decree in the Circuit Court, the legislative assembly abolished the office of game warden and master fish warden, and the duties, so far as they are material here, which had been exercised by that officer, were transferred to and imposed upon a fish commission provided for by Chapter 1, Laws Sp. Sess., 1920. Chris Schmidt, Frank M. Warren, and Charles Hall were selected and qualified as members of the fish commission, and for that reason the litigants stipulated that the commissioners should be substituted as defendants.

AFFIRMED.

For appellants there was a brief over the name of *Messrs. Norblad & Hesse,* with an oral argument by *Mr. A. W. Norblad.*

For respondent there was a brief over the names of *Mr. George M. Brown,* Attorney General, *Mr. J. O. Bailey,* Assistant Attorney General, and *Mr. J. J. Barrett,* District Attorney, with an oral argument by *Mr. Bailey.*

HARRIS, J.—The questions to be decided can be better considered and discussed if we first give an account of the fish legislation, affecting the Columbia River, enacted in the States of Oregon and Washington in the years 1915, 1917, and 1919. In 1915, conference committees were appointed by the legislative assemblies of the two states, with the view of agreeing upon fish legislation concerning the Columbia River

and other waters. The conference committees met and discussed proposed legislation, and as a result the legislative assembly of Oregon passed a ''new Fish Code'' providing for the regulation of the taking of salmon from the waters of the Columbia River, over which the States of Oregon and Washington have concurrent jurisdiction, and from other waters within the boundaries of the State of Oregon. This ''new Fish Code'' is also known as Chapter 188, Laws of 1915; and Section 20, the material section here of the chapter, reads as follows:

''Should Congress, by virtue of the authority vested in it under Section 10, Article One of the Constitution of the United States, providing for compacts and agreements between states, ratify the recommendations of the conference committees of the States of Oregon and Washington, appointed to agree on legislation necessary for the regulation, preservation and protection of fish in the waters of the Columbia River, over which said states have concurrent jurisdiction, and other waters within either state, which would be affected by said concurrent interest, recommendation being as follows:

'' 'We further recommend that a resolution be passed by the legislatures of Washington and Oregon, whereby the ratification by Congress of the laws of the States of Oregon and Washington shall act as a treaty between said states, subject to modification only by joint agreement by said states'; and said recommendation having been approved by resolution adopting the report of the conference committee, then, and in that event, there shall exist between the States of Oregon and Washington a definite compact and agreement, the purport of which shall be substantially as follows:

''All laws and regulations now existing, or which may be necessary for regulating, protecting or preserving fish in the waters of the Columbia River, over which the States of Oregon and Washington

have concurrent jurisdiction, or any other waters within either of said states, which would affect said concurrent jurisdiction, shall be made, changed, altered and amended in whole or in part, only with the mutual consent and approbation of both states."

In 1915, the legislative assembly of Washington enacted a "Fisheries Code." This Code appears as Chapter 31, Laws of Washington 1915. Section 116, the material section here, is as follows:

"Should Congress, by virtue of the authority vested in it under Section 10, Article I, of the Constitution of the United States, providing for compacts and agreements between states, ratify the recommendations of the conference committees of the States of Washington and Oregon, appointed to agree on legislation necessary for the regulation, preservation and protection of fish in the waters of the Columbia River, or its tributaries, over which said states have concurrent jurisdiction, or which would be affected by said concurrent jurisdiction, said recommendation being as follows: 'We further recommend that a resolution be passed by the legislatures of Washington and Oregon, whereby the ratification by Congress of the laws of the States of Washington and Oregon shall act as a treaty between said states, subject to modification only by joint agreement by said states'; and said recommendation having been approved by resolution adopting the report of the conference committee, then, and in that event, there shall exist between the States of Washington and Oregon a definite compact and agreement, the purport of which shall be substantially as follows:

"All laws and regulations now existing or which may be necessary for regulating, protecting or preserving fish in the waters of the Columbia River, or its tributaries, over which the States of Washington and Oregon have concurrent jurisdiction, or which would be affected by said concurrent jurisdiction, shall be made, changed, altered and amended in whole or

in part, only with the mutual consent and approbation of both states.''

The legislative assembly of each state adopted a resolution in 1915 requesting Congress to consent to and ratify the agreement made by Oregon and Washington, so as to comply with the requirements of Article I, Section 10, of the Constitution of the United States: S. C. R. No. 5, Laws of Oregon 1915, p. 618. Congress having failed to act upon the resolution submitted in 1915, the legislative assemblies of the two states in 1917 again adopted resolutions, requesting Congress to give its consent to the agreement made by the two states in 1915. Congress finally heeded the request by passing the act of April 8, 1918, consenting to the agreement: 40 Stat. 515. The act of Congress is as follows:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Congress of the United States of America hereby consents to and ratifies the compact and agreement entered into between the States of Oregon and Washington relative to regulating, protecting, and preserving fish in the boundary waters of the Columbia River and other waters, which compact and agreement is contained in section twenty of chapter one hundred and eighty-eight of the General Laws of Oregon for nineteen hundred and fifteen, and section one hundred and sixteen, chapter thirty-one, of the Session Laws of Washington for nineteen hundred and fifteen, and is as follows:

" 'All laws and regulations now existing, or which may be necessary for regulating, protecting, or preserving fish in the waters of the Columbia River, over which the States of Oregon and Washington have concurrent jurisdiction, or any other waters within either of said States, which would affect said concurrent jurisdiction, shall be made, changed, altered,

and amended in whole or in part, only with the mutual consent and approbation of both States.'

"Nothing herein contained shall be construed to affect the right of the United States to regulate commerce, or the jurisdiction of the United States over navigable waters."

By the terms of Section 18, Chapter 188, Laws of Oregon 1915, it was made unlawful for any person to purchase any food fish unlawfully taken from any of the waters of this state, or from any of the waters over which the State of Oregon had concurrent jurisdiction during any closed season prescribed by law. In 1917, Section 18 of Chapter 188, Laws of Oregon 1915, was amended so as to read as follows:

"It shall be unlawful for any person to purchase, or offer for sale, any food fish of any variety unlawfully taken from any of the waters of this state, or from any of the waters over which the State of Oregon has concurrent jurisdiction, or to have in their possession or to purchase or offer for sale, any salmon fish' of any variety taken beyond the three-mile line outside of the Columbia River, during any closed season prescribed by law; and any person who purchases or offers for sale any such fish, during any such period, shall be guilty of a violation of this act": Section 3, Chapter 219, Laws 1917.

By the terms of Section 65, Chapter 31, Laws of Washington 1915, it was unlawful to purchase any food fish unlawfully taken from the waters of Washington during any of the closed seasons prescribed by that act. In 1917 the legislative assembly of Washington amended Section 65 of Chapter 31, Laws of 1915, so as to make it read as follows:

"It shall be unlawful for any person, firm or corporation to purchase, handle, deal in or have in his possession except for the sole use of himself and family any food fish of any variety which were taken from the waters of this state during any of the closed

seasons prescribed in this act, and any person who purchases, handles, deals in or has in his possession any such fish during such periods, except for the sole use of himself and family, shall be guilty of a misdemeanor.   And it shall be unlawful for any person, firm, or corporation to purchase, handle, deal in, or have in his possession, except for the sole use of himself and family any salmon fish of any variety which were taken beyond the three mile limit outside of the Columbia River, during any of the closed seasons prescribed in this act: *Provided, however,* That this provision shall not apply to salmon taken beyond the three mile limit outside the Straits of Juan de Fuca'': Section 16, Chapter 169, Laws of Washington 1917.

On November 20, 1918, Section 16 of Chapter 169, Laws of Washington 1917, was held to be unconstitutional by the Supreme Court of Washington: *State v. Belknap,* 104 Wash. 227 (176 Pac. 5, 182 Pac. 570).

In 1919, the legislative assembly of Washington did not enact any statute which is any wise material here; but in Oregon the legislature, which convened in that year, enacted Chapter 367.   In addition to Section 5, already quoted, there is another material section to be found in Chapter 367, Laws of Oregon 1919, for Section 10 of that act expressly repeals Section 18 of Chapter 188, Laws of Oregon 1915, as amended by Section 3 of Chapter 219, Laws of Oregon 1917.

The plaintiffs say that Section 5 of Chapter 367, Laws of Oregon 1919, is ineffective because: (1) It is not a valid exercise of the police power of the state; (2) it is discriminatory and not general in its operation, and is therefore violative of Article I, Section 20, of the state Constitution and of Article XIV, Section 1, of the federal Constitution; (3) it infringes upon the foreign and interstate commerce clause of Article I, Section 8, of the federal Constitution; and

(4) it impairs the obligations of the contract embodied in the compact between Oregon and Washington, and hence is violative of Article I, Section 10, of the Constitution of the United States, and of Article I, Section 21, of the state Constitution.

The litigants do not agree upon the construction to be placed on the words "beyond the three-mile line outside of the Columbia River" found in Section 5, Chapter 367, Laws of 1919. The defendant argues that the quoted language means "the space where fishermen are accustomed to fish for salmon, using landing places along the Columbia River or at the mouth of the river as their base." The plaintiffs interpret the language of Section 5 of the statute to cover that space which is west of the three-mile line and between the north and south boundary lines of the Columbia River projected west from and beyond the three-mile line. The construction given by the plaintiffs does not confine the operation of the statute to such narrow limits as to make it absurd and unreasonable or as to defeat the purpose of the enactment, for when we are told that it is seven miles from the south headland to the north headland at the mouth of the river, we at once understand that the statute refers to a large area. The words "beyond the three-mile line," when considered as standing alone, are broad, comprehensive, and unlimited; for any point, whether off the Oregon or the Washington or the California or the British Columbia or the Alaskan coast, would be beyond the three-mile line, if more than three miles from the shore; and hence, when we find the unrestricted words "beyond the three-mile line," immediately followed by the words "outside of the Columbia River," we at once know that the latter words are words of limitation, because

otherwise they would be utterly inoperative and use-
less.

1–3. One of the accepted rules of statutory con-
struction requires courts to so construe a statute as
to give effect to every clause, if possible: *Henry* v.
*Yamhill Co.,* 37 Or. 562, 564 (62 Pac. 375); *In re Wil-
low Creek,* 74 Or. 592, 614 (144 Pac. 505, 146 Pac.
475); 25 R. C. L. 1004. In construing a statute,
ascertainment of the intention of the legislature is
the "consummation devoutly to be wished"; and, if
the words of the statute are not of themselves suffi-
ciently explicit to manifest the intention of the law-
makers,' the intention is then to be ascertained by
considering the context, the subject matter, the neces-
sity for the law, and the circumstances under which
it was enacted, the mischief sought to be remedied,
and the object to be attained; 25 R. C. L. 1012; 36
Cyc. 110. If, however, the intention of the legis-
lature cannot be discovered, the court should give the
statute a reasonable construction consistent with the
general principles of law: 36 Cyc. 1108.

The Columbia River salmon has acquired a world-
wide reputation for excellence as a food fish. The
business of catching, canning, and packing salmon
has developed into one of the leading industries of
this commonwealth, and the value of the annual pack
amounts to millions of dollars. Although there are
canneries located on the Rogue, the Umpqua, and the
Siletz Rivers, and other coastal streams in this state,
the major portion of the annual salmon' pack comes
from the Columbia River. The habits of salmon are
such that when they "run" from the sea to fresh
water for spawning purposes most of them "run" to
the waters where they themselves were propagated;
and hence, most of the salmon which have been propa-

gated in the Columbia River and its tributaries, when they "run" from the sea, enter the Columbia River, and not some other stream emptying into the sea. In order to protect and preserve this food fish, which furnishes the basis of one of the state's largest industries, it has been found necessary to close the waters of the Columbia to fishermen during certain periods. The closed season for a given stream is fixed with reference to the habits of the salmon which each year are expected to "run" up that stream. Experience and observation have shown that the salmon, before beginning to "run" up the Columbia River, congregate in large numbers off the mouth of the river, and the "run" of salmon up the river continues for a considerable period. The closed season is so timed and fixed as to enable a portion of the "run" to ascend the river without molestation and thus furnish the necessary supply for both natural and artificial propagation. There are, of course, closed seasons prescribed for each of the Oregon coastal streams in which salmon are found. However, the closed season for a given stream is fixed with reference to the habits of salmon found in that stream, and not with reference to the habits of salmon running up other streams, because the annual "run" in one stream does not coincide in point of time with the "run" in another stream; and the necessary result is that during a given period the Columbia may be open and at the same time one or several of the other coastal streams may be closed to fishermen; or, on the other hand, the Columbia may be closed while one or several of the other streams may be open to fishermen. It is apparent that, because of these differences in the closed seasons prescribed for the different streams, the legislature,

when framing and enacting Section 5 of Chapter 367, was legislating with reference to the conditions found in the Columbia River. For example, during a portion of the time when the waters of the Columbia are closed, the season is open on the Siuslaw River. Now, it is manifest that the legislature did not intend to say that fish caught off the Siuslaw River and beyond the three-mile line at a time when the season was open on the Siuslaw, but closed on the Columbia, could not be brought into this state and possessed here.

4. The word "outside" is formed by combining two words, "out" and "side"; and, among other definitions the combined word is defined thus: "Outside of, on or to the exterior of; without; outward from"; Cent. Dict. If a line be projected west from the north headland of the Columbia River and another line be similarly projected from the south headland to and across the three-mile line and if that part of the three-mile line which is between the two projected lines is taken as the side of the Columbia River, then the word "outside," when given a natural and not an artificial or strained signification, means the waters *on* the exterior of such side. The construction placed upon the statute by the plaintiffs, not only gives to the word "outside" a natural meaning, but it possesses the additional merit of being definite and certain. Moreover, this construction of the statute does not lead to absurd results; but, on the other hand, it enables the state, through its proper officers, to effectuate the purposes of the statute by dealing with conditions as they actually exist.

5. When the state through its legislature enacted the statute now in controversy, it did so upon the assumption that the enactment was an exercise of the

98 Or.—43

police power. Because of the wide range over which this power may be exercised, it is difficult, if not impossible, to mark out in advance the exact limits of its reach; and therefore it cannot be accurately defined although it may be understandingly described. A concise statement, which emphasizes the thought that the field within which the police power may be exerted is very broad, is found in *State* v. *Redmon,* 134 Wis. 89, 105 (114 N. W. 137, 126 Am. St. Rep. 1003, 15 Ann. Cas. 408, 14 L. R. A. (N. S.) 229), where it is said:

"It is the power to make all laws which in contemplation of the Constitution promote the public welfare."

The police power embraces the whole sum of inherent sovereign power which the state possesses, and, within constitutional limitations, may exercise for the promotion of the order, safety, health, morals, and general welfare of society: 12 C. J. 904; *Stettler* v. *O'Hara,* 69 Or. 519, 531 (139 Pac. 743, Ann. Cas. 1916A, 217, L. R. A. 1917C, 944); *Mill Creek Coal & Coke Co.* v. *Public Service Commission* (W. Va.), 100 S. E. 557 (7 A. L. R. 1081).

6. The preservation of fish and game has always been treated as being within the proper domain of the police power; and, consequently, when the lawmakers passed the act of 1919, they legislated concerning a subject which is clearly within the embrace of the police power: *Lawton* v. *Steele,* 152 U. S. 133 (38 L. Ed. 385, 14 Sup. Ct. Rep. 449); *Geer* v. *Connecticut,* 161 U. S. 519 (40 L. Ed. 793, 16 Sup. Ct. Rep. 600); *Silz* v. *Hesterberg,* 211 U. S. 31 (53 L. Ed. 75, 129 Sup. Ct. Rep. 10); *State* v. *Schuman,* 36 Or. 16, 25 (58 Pac. 661, 78 Am. St. Rep. 754, 47 L. R. A. 153).

7-9. The legislature, it is true, is not the final judge of the limitations of the police power, and, since the legislative action must be reasonably necessary for the public benefit, the validity of all police regulations depends upon whether they can ultimately pass the judicial test of reasonableness; and yet, it is also true that it is the legislative function primarily to determine the necessity or expediency of measures adopted. When, however, the courts are called upon to apply the judicial test of reasonableness, they will accord to the legislature a large discretion in determining, not only what the interests of the public require, but also what measures are necessary for the protection of such interests: *Lawton* v. *Steele,* 152 U. S. 133 (38 L. Ed. 385, 13 Sup. Ct. Rep. 499); *Silz* v. *Hesterberg,* 211 U. S. 31 (53 L. Ed. 75, 29 Sup. Ct. Rep. 10); *Ex parte Mon Luck,* 29 Or. 421, 426 (44 Pac. 693, 54 Am. St. Rep. 804, 32 L. R. A. 738); *Lorntsen* v. *Union Fisherman's Co.,* 71 Or. 540, 547 (143 Pac. 621); *State* v. *Redmon,* 134 Wis. 89 (114 N. W. 137, 126 Am. St. Rep. 1003, 15 Ann. Cas. 409, 14 L. R. A. (N. S.) 229); 12 C. J. 933. Moreover, when applying the test of judicial reasonableness, the presumption is in favor of the reasonableness and validity of the regulation: 12 C. J. 934.

10. The plaintiffs insist that Section 5 of the statute is an unreasonable police regulation, because it is unusual, fails to accomplish its avowed purpose, and is unduly oppressive upon individuals "and the financial resources of the great fishing industry." That Section 5 is unusual may be conceded; but it must also be conceded that the conditions attempted to be met are unusual. It is not unusual to find statutes prescribing closed seasons; nor is it unusual to find the law so framed as to make it unlawful to sell, pur-

chase, or possess game or fish during the closed season, even if originally taken and brought from without the state which enacted the law. As already pointed out, the salmon "runs" do not occur in all the streams at the same time, and consequently it is impracticable to prescribe the same closed season for all the streams. When legislation is enacted for the protection of fish in the Columbia it must, in order to accomplish its purpose, be framed with reference to conditions found to exist in the waters of that river, and it is manifest that Section 5 was in fact framed with reference to the conditions existing there; and hence, the provisions of Section 5 are unusual only to the extent that the conditions which called for the adoption of the measure were and are unusual.

11. Of course the State of Oregon has no jurisdiction over the waters of the Pacific Ocean beyond the three-mile line; nor did the state by the enactment of the statute in question attempt to make fishing beyond the three-mile limit unlawful. The statute was adopted in order to make effective the prohibition against taking fish during the closed season from waters over which the state may rightfully exercise jurisdiction, and that the state has authority to do this is settled beyond controversy: *Silz* v. *Hesterberg*, 211 U. S. 31 (53 L. Ed. 75, 29 Sup. Ct. Rep. 10, see, also, Rose's U. S. Notes).

12. Since there is no statute like Section 5 in force in the State of Washington, canneries operated on the Washington side of the Columbia River can, without hindrance, purchase and pack, during the closed season, salmon caught beyond the three-mile line outside of the Columbia River, with the result that Washington canneries are permitted, during the

closed season, to pack the same fish which the Oregon canneries are prohibited from packing during that time. The conditions permitted to exist on the Washington side of the river do not defeat the object sought to be accomplished by the Oregon statute, although they do interfere with and probably prevent the full and complete attainment of the object sought to be accomplished by the Oregon statute. Absence of like legislation in the State of Washington affects only the degree of protection, but it does not entirely prevent protection. It may be true that the Columbia River salmon would be better protected if the State of Washington had enacted and now enforced legislation like Section 5 of our statute; and, indeed, if we correctly understood the argument of counsel for the plaintiffs at the hearing, the plaintiffs themselves say that they would be pleased to see British Columbia and the States of Washington, Oregon, and California pass legislation similar to Section 5, because such legislation, if in force in British Columbia and in the three named states, would undoubtedly be helpful in preserving and protecting salmon as a food fish. The contention of the plaintiffs that Section 5 is an unreasonable exercise of the police power cannot be sustained.

13. The argument that Section 5 is discriminatory and not general in its application, and therefore unconstitutional, is answered adversely to the position taken by the plaintiffs in the opinions rendered in *State* v. *Savage,* 96 Or. 53 (184 Pac. 567, 189 Pac. 427), and *State* v. *Blanchard,* 96 Or. 79 (189 Pac. 421). See, also, 11 R. C. L. 1045.

14. The holding in *Silz* v. *Hesterberg,* 211 U. S. 31 (53 L. Ed. 75, 29 Sup. Ct. Rep. 10, see, also, Rose's U. S. Notes), is authority for the conclusion that

Section 5 of our statute does not contravene the foreign and interstate commerce clause of the federal Constitution: See, also, *State* v. *Schuman,* 36 Or. 16 (58 Pac. 661, 78 Am. St. Rep. 754, 47 L. R. A. 153); *Ex parte Maier,* 103 Cal. 476 (37 Pac. 402, 42 Am. St. Rep. 129); *Ex parte Fritz,* 86 Miss. 210 (38 South. 722, 109 Am. St. Rep. 700); 5 R. C. L. 762.

The next contention urged by the plaintiffs is that the compact between the States of Washington and Oregon is a contract, and that it is therefore protected by the state and federal Constitutions against legislation impairing its obligations: *Green* v. *Biddle,* 8 Wheat. 1 (5 L. Ed. 547); *Poole* v. *Fleeger,* 11 Pet. 185 (9 L. Ed. 680); *Virginia* v. *Tennessee,* 148 U. S. 503 (37 L. Ed. 537, 12 Sup. Ct. Rep. 728); *Wharton* v. *Wise,* 153 U. S. 155 (38 L. Ed. 669, 14 Sup. Ct. Rep. 783, see, also, Rose's U. S. Notes).

15. For the purposes of the instant case we shall assume, without attempting to decide, that the compact entered into between Oregon and Washington is binding upon both parties to the extent that one cannot withdraw without the consent of the other, and that therefore one state cannot, without the "consent and approbation" of the other state, enact any law which would conflict with the terms of the compact. Again directing attention to the compact, we observe that the two states have expressly limited their agreement to laws and regulations "which would affect said concurrent jurisdiction." As ruled by the United States Circuit Court of Appeals for the Ninth Circuit, in *Olin* v. *Kitzmiller,* 268 Fed. 348, recently decided: "It is only as to its common right with the adjoining state to take fish from those waters that its right is limited by the compact." This state has not attempted to change the closed season. The prohibi-

tion of the Oregon statute is operative only during the periods which both states have fixed as the closed seasons on the Columbia. The inhibition of Section 5 merely aids in keeping such seasons closed. Section 5 does not "affect" the "concurrent jurisdiction" of the two states, and, indeed, it recognizes, rather than ignores, the jurisdiction which the two states have concurrently exercised.

Our conclusion is that the ruling made by the Circuit Court was correct; and hence the decree appealed from is affirmed.                                         Affirmed.

McBride, C. J., and Burnett and Johns, JJ., concur.

---

Denied January 25, 1921.

On Petition for Rehearing.
(194 Pac. 854.)

On petition for rehearing.                               Denied.

*Messrs. Norblad & Hesse,* for the petition.

*Mr. J. J. Barrett,* District Attorney, *Mr. George M. Brown,* Attorney General, and *Mr. J. O. Bailey,* Assistant Attorney General, *contra.*

McBRIDE, J.—We have carefully considered the able brief of counsel for the plaintiffs filed with the petition for a rehearing. While the arguments therein restate forcibly and vividly the objections to the act of 1919, they fail to convince us that such act is unconstitutional or in any respect affected by the compact between the States of Oregon and Washington relating to the protection of salmon in the waters

over which the states have concurrent jurisdiction. That the usefulness of the act as a protective measure is largely impaired by the failure of the State of Washington to enact similar legislation is patent. That the use of purse seines and like appliances at the mouth of the Columbia River by Washington fishermen will eventually greatly impair, if not destroy, the value of the Columbia River as a producer of salmon, is plain to everyone familiar with the subject. That our present law operates harshly upon Oregon fishermen and canneries cannot be disputed. But these are considerations that properly address themselves to the legislatures of the two states, and not to the courts. The fact remains that Oregon has done its part to protect an industry which is a source of millions of dollars of profit to the citizens of both states, while Washington, with an equal interest in such protection, has failed so far to act effectively in the matter.

Perhaps as a matter of even-handed justice the present law should be repealed, and Oregon canneries be allowed to participate in the spoliation of the salmon industry on the Columbia River equally with the canneries on the Washington side of the river, but this court cannot effect such repeal by declaring the law unconstitutional. The legislatures of both states are now in session, and it is unthinkable that they will sit idly by without mutually devising a remedy for conditions which threaten to destroy a great industry.

The petition for rehearing is denied.

AFFIRMED.    REHEARING DENIED.

BURNETT, C. J., and JOHNS and HARRIS, JJ., concur.